HANS J. LILJEBERG, Judge.
|20n August 10, 2010, the Jefferson Parish District Attorney filed a bill of information charging defendant, Carol H. Banks, with three counts of La. R.S. 14:32, causing the deaths of Gerard Faucheaux, Nelson Faucheaux, and Shirley Faucheaux.[1] Thereafter, the State filed three superseding bills of information, ultimately charging defendant with three counts of vehicular homicide in violation of La. R.S. 14:32.1(A)(6).[2] On February 7, 2012, defendant pleaded not guilty to the charges.
Defendant proceeded to trial on August 16, 2012. On August 18, 2012, a six-person jury unanimously found the defendant guilty of three counts of the responsive verdict of negligent homicide, a violation of La. R.S. 14:32.
On May 10, 2012, the trial court denied defendant’s motions to reinstate order for presentence investigation, arrest of judgment, post verdict judgment of |sacquittal and new trial. On that same'date, the trial court sentenced defendant to imprisonment at hard labor for a term of five years on each count to be served concurrently. The trial court suspended two of the five years and ordered defendant, upon release from the custody of the Department of Corrections, to serve two years on home incarceration. The trial court thereafter granted defendant’s motion for appeal.
On June 20, 2012, the trial court denied defendant’s motion to reconsider sentence. Defendant’s appeal follows.

FACTS

Prosecution was initiated against defendant as a result of a multi-car collision that occurred on Interstate 10, between the Williams and Loyola exits, at approximately 3:30 p.m. on February 10, 2010. The collision resulted in the deaths of Gerard Faucheaux and his parents, Nelson and Shirley Faucheaux. All three victims died of blunt-force trauma sustained in the crash. The State maintained at trial that defendant knowingly consumed excessive amounts of dextromethorphan that led to her impairment and ultimately to the collision that caused the deaths of the three victims.

The collision

The facts surrounding the mechanics of the collision itself were largely undisputed at trial and were introduced through the expert testimony of accident reconstruc-tionists, Officer William Bagert of the Ken-ner Police Department and Trooper Trey Elliot of the Louisiana State Police. The accident reconstruction and witness statements revealed that four vehicles were *538 involved in the crash: a Mercury Grand Marquis operated by defendant (Vehicle 1), a Toyota Sienna operated by Gerard Faucheaux (Vehicle 2), a Buick LeSabre operated by Mia Ahn (Vehicle 3), and a Chevrolet Tahoe operated by Hjalmar Breit (Vehicle 4).
| ¿Vehicles 1, 2, and 3 were travelling west on Interstate 10 with Vehicle 1 in the left lane, Vehicle 2 in the center lane, and Vehicle 3 in the right lane. Vehicle 1 made an erratic lane change from the left lane to the center lane, striking the left-rear bumper of Vehicle 2, as evidenced by the paint transfer from Vehicle 2 to Vehicle 1, and then veered into the right lane, striking the left-rear bumper of Vehicle 3. Vehicle 3 came to a controlled stop; however, the collision sent Vehicle 2 across the grassy, unobstructed median and into oncoming eastbound traffic, where it was unavoidably T-boned by Vehicle 4. It was stipulated that the occupants of Vehicle 2, Gerard, Nelson, and Shirley Faucheaux, died upon impact. Defendant, operator of Vehicle 1, continued westbound for approximately one-half of a mile before coming to a controlled stop on the right shoulder of Interstate 10.
The events that transpired leading to and following the collision, however, were largely disputed. Defendant’s version of events are as follows: Defendant testified that she took one capsule of non-drowsy Dayquil for a slight runny nose at approximately 6:00 a.m. on the day of the crash and could not remember if she took a second capsule at lunch that day. She explained that she took Dayquil in the past and did not suffer side effects. Defendant testified that she left work at the Upper Room Bible Academy in New Orleans East at 3:05 p.m. and was headed to Sam’s Club in Kenner. Defendant explained that she was driving west on Interstate 10 in the left lane when she glanced in her rearview mirror and observed a black SUV right on her rear bumper flashing its high beams. Defendant moved to the right lane to allow the black SUV to pass, but the black SUV instead positioned itself directly in front of her and slammed on its brakes. Defendant testified that she moved to the middle lane to avoid the black SUV, but the black SUV again moved in front of her, forcing defendant to slam on her brakes. She | ^testified that the force of having to slam on her brakes caused everything in her vehicle to hit the floor.
Defendant testified that the driver of the black SUV made an obscene hand gesture to her by putting up her middle finger and explained that she feared the driver would pull a gun and shoot at her car because of how crazy the black SUV was driving. She testified that she began to feel very warm and the back of her neck tight. She stated that she could not catch her breath and thought she might be having a heart attack. Defendant testified that the next thing she remembered was a boom sound and then her air bags inflated. She stated that she felt like she was floating, and it did not seem real. Defendant further testified that the car was smoking and there was a bad odor in the vehicle. Defendant finally guided herself over to the right and saw the Loyola exit. She testified that her head and chest were hurting and she bent down to look for her phone.
Defendant stated that she realized something had happened because her air bags deployed, but she did not know whether something hit her or if she hit something. She thought the woman in the black SUV possibly hit her. Defendant testified that from the time she became conscious of her surroundings and the time she pulled over, she did not notice anyone following her. Defendant then called 911.
Defendant eventually exited her vehicle and went to the trunk of her car to get an *539 aspirin from her purse, but did not recall if she took the aspirin. She testified that she noticed a man in a white truck parked behind her, but she did not pay much attention to him.
Defendant testified that she did not know anything about the Toyota Sienna or the Buick LeSabre, and had no conscious memory of striking either vehicle. She further stated that she did not learn that three people were killed in the crash | Buntil after she was transferred to the Gretna jail and saw the news story on television.
Lisa Bradley testified at trial for the defense that she, too, was driving on Interstate 10 heading west through Kenner when she witnessed the crash. Ms. Bradley testified she was travelling in the center lane when defendant and a black SUV came along her right-hand side fairly fast. Ms. Bradley testified that it appeared that it was perhaps teenagers playing cat and mouse, and that the vehicles were weaving and bobbing in and out of traffic. Ms. Bradley testified that the black SUV was travelling approximately 80 — 85 miles per hour chasing the defendant. She stated that it appeared that defendant was trying to get away from the black SUV. Ms. Bradley testified that she observed a vehicle cross the median and get struck by a white pickup truck, but did not see the impact that caused the vehicle to cross the median. Ms. Bradley also called 911 and gave a statement to police.
Sean O’Brien King additionally testified that he witnessed the multi-car collision while heading westbound in the center lane. Mr. King testified that defendant’s vehicle drove alongside of him “just flying” at a high rate of speed. Mr. King testified that he saw defendant try to get over to the right lane, almost hit a vehicle, then jerk back over. Mr. King testified that when defendant jerked back to the center lane, she struck the Toyota Sienna, causing the Sienna to fishtail. Mr. King testified that the Sienna crossed into oncoming eastbound traffic, resulting in a massive collision.
Mr. King further testified that he observed defendant continue west on Interstate 10. Mr. King stated that he followed closely behind her and called 911. Mr. King testified that she eventually pulled over right before the Loyola exit because he was right on her bumper. Mr. King testified that defendant exited her JLvehicle, stared him down, and then went into her trunk and began moving objects around. Mr. King testified that defendant then sat in the backseat, emptied out a foam cup, and was “acting real weird,” behaving as if nothing happened. Mr. King testified that he did not see any vehicle following defendant, that all other vehicles were travelling at normal speeds, and that he did not see a black SUV near defendant’s vehicle.
Lena Liller testified that she observed the multi-car collision while heading west on Interstate 10 travelling in the far right-hand lane. Ms. Liller testified that she was about to exit at Loyola when she saw defendant’s vehicle drive on the left-hand side of her and hit the victims’ Sienna. Ms. Liller testified that the Sienna went tumbling over the median and into oncoming traffic. Ms. Liller testified that the Tahoe (Vehicle 4), travelling east, did not have a chance and slammed into the victims’ vehicle. Ms. Liller also testified that defendant veered into her lane, forcing Ms. Liller to swerve to the right shoulder of the road. Ms. Liller also observed defendant’s vehicle swipe and hit another vehicle in front of Ms. Liller. Ms. Liller also added that no one was chasing defendant and that she did not see a black SUV anywhere.
Mia Ahn testified at trial that she was driving a Buick LeSabre (Vehicle 2) on the *540 date of the crash, traffic was very heavy, and someone hit her vehicle. Ms. Ahn also testified that she did not see a black SUV. Ms. Ahn was unaware who or what kind of vehicle struck her.
As noted above, Officer William Bagert of the Kenner Police Department’s traffic services section testified as one of the initial investigators on the scene and as an expert in accident reconstruction and investigation. In addition to his testimony regarding the reconstruction of the collision, he testified that he interviewed defendant at approximately 8:00 p.m., more than four hours after the | Scrash. Officer Bagert testified that defendant stated to him that she was involved in a road rage incident with a black SUV. She stated to him that the driver of the black SUV was a female who made obscene gestures at her.
Officer Bagert testified that defendant “acted strangely” and “didn’t seem right” at his initial meeting with her, but could not articulate a specific form of impairment such as dilated pupils or slurred speech. Officer Bagert did note, however, that defendant appeared disoriented and could not clearly recall the event. He stated that she “seemed that she was disassociated from what was going on. She was, like, in a separate reality.”
Officer Bagert acknowledged that it is possible that the deployment of an airbag could cause disorientation and irritated vision. He additionally testified that defendant was driving 10 to 15 miles per hour more than the victims’ vehicle, but could not make a determination as to defendant’s exact speed prior to impact.
Trooper Trey Elliot of the Louisiana State Police additionally testified as an expert in accident reconstruction and investigation. Trooper Elliot’s testimony greatly corroborated the testimony of Officer Bagert. He testified that while moving at a greater speed than the victims’ Sienna, defendant’s vehicle struck the victims’ vehicle at a 30 to 45 degree angle, which affected the center mass of the van causing it to rotate. Trooper Elliot testified that defendant’s Grand Marquis continued towards the right lane and collided with the Buick LeSabre. Trooper Elliot testified that while this occurred, the victims’ vehicle went across the center and left westbound lanes of Interstate 10 West, continued through the median, and was struck by the white Chevy Tahoe in a broadside collision. Trooper Elliot testified that defendant’s vehicle continued for about a half mile onto the exit area of Interstate 10 west of Loyola and came to a controlled stop on the right. Trooper Elliot testified the evidence that defendant’s vehicle came to a controlled stop | ^included that a half mile would not be a reasonable distance for a vehicle to travel while out of control, the manner the vehicle came to rest on the grass, and the manner the vehicle was parked in front of one light pole and essentially in between two light poles. Trooper Elliot also testified that he was unable to determine the exact speed of defendant’s vehicle.

Chemical Analysis

The parties stipulated that defendant voluntarily provided a blood sample on the date of the offense, and that chemical analysis of the sample revealed the presence of 74.6 nanograms of dextromethorphan per milliliter of blood (ng/mL) and an absence of any metabolites of dextromethorphan. In addition, no alcohol was detected in defendant’s blood.
Dr. William George, an emeritus professor at Tulane University, testified for the State as an expert in the fields of toxicology and pharmacology. Dr. George explained that dextromethorphan is a drug contained in numerous over-the-counter medications that claim to treat the symptoms of cough and cold, including Dayquil. *541 The Dayquil retail packaging introduced into evidence at trial provided that one dose is two capsules and that each capsule contains “dextromethorphan HBr 10 mg.” Dr. George explained that dextromethor-phan, when taken at the recommended dosage, suppresses cough, but when taken at higher dosages may cause drowsiness, dizziness, and an effect “likened to that of certain other drugs like ketamine, which is a dissociative anesthetic,” in which a person “doesn’t really recognize exactly where [they] are or what’s going on.”
Dr. George testified that the standard recommended dose of dextromethorphan (20 milligrams or two capsules) will produce a blood level or concentration of 2 or 3 ng/mL or at most 4 ng/mL, assuming a person weighing |in160 pounds.[3] Therefore, Dr. George testified that defendant’s blood concentration of 74.6 ng/mL of dex-tromethorphan was not consistent with defendant’s testimony at trial that she took one Dayquil capsule (10 mg) at approximately 6:00 a.m. on the day of the accident and possibly a second capsule (10 mg) at lunchtime. Instead, Dr. George explained that the concentration of dextromethor-phan in defendant’s blood was greater than one would expect from five doses in an average individual.
Upon reviewing a lab report introduced by the defense of genetic testing performed by Genelex, Dr. George explained that an analysis of defendant’s genetic makeup revealed that defendant has an atypical isoprene enzyme resulting in an inability to metabolize dextromethorphan. He further explained that the result of this inability is that a single dose of dextrome-thorphan would produce a higher blood concentration of dextromethorphan and a greater effect in defendant than it would in an average individual. This evidence, however, did not affect Dr. George’s opinion that a blood concentration of dextrome-thorphan of 74.6 ng/mL is irreconcilable with a person taking one or two doses of dextromethorphan, even assuming no metabolism whatsoever. Dr. George further testified, however, that based upon the lab report, he was unable to determine the quantity of the medication consumed by defendant, when it was consumed, or how frequently it was .consumed. He additionally testified that from a toxicology or pharmacology point of view, he could not determine whether defendant knowingly exceeded the dosage recommended by the manufacturer.
The defense additionally questioned Dr. George regarding the defense’s independent chemical testing of defendant’s blood. The independent testing was performed approximately two years after the blood sample was drawn from |n defendant and indicated a blood concentration of dextro-methorphan of only 13 ng/mL.[4] When asked to explain the discrepancy in the results, Dr. George explained that it would be logical to expect some degradation in a blood specimen kept for two years.

Defendant’s Mental State

Last, the defense presented testimony of Dr. Jeffrey Nicholl, an associate professor and former director of neurology and psychiatry at Tulane University, as an expert in neurology, clinical neurophysiology, epilepsy monitoring and emergency medicine.[5] Dr. Nicholl testified that in his *542 opinion defendant suffered a syncopal episode and essentially fainted or “passed out” during the incident. Dr. Nicholl testified that defendant described symptoms of feeling flushed, having spots before her eyes, ringing in her ears, shortness of breath, palpitations, heart pounding, swea-tiness, and dizziness. Dr. Nicholl testified that the symptoms defendant described are classic “presyncope,” which is how a person feels right before one passes out from fainting. Dr. Nicholl testified that he had no reason to believe that defendant was being untruthful, and it would be unlikely for a person with no medical training to give him that set of symptoms to submit that they had fainted.
Dr. Nicholl further explained that during an actual syncopal event the brain is not getting enough oxygen, and the patient is unconscious. Dr. Nicholl testified that not everyone who is “presyncopal” actually loses consciousness. Dr. Nicholl explained that it is a sliding scale that depends on the degree of inadequate blood flow and that during a syncopal event a person can be unconscious, or could gray out and not remember what happened. Dr. Nicholl testified that he believed | ^defendant’s fear and anxiety from being harassed by the driver in the black SUV caused her to faint. He testified that defendant’s amnesia suggests there was a marked degree of lack of blood flow, but he could not say with certainty that she was totally unconscious without having examined her right at that moment.
Dr. Nicholl also testified that syncope is not one of the side effects listed in the literature and package insert of Dayquil and testified that through his evaluation of defendant and his research, he found nothing to suggest that dextromethorphan caused defendant to faint.
On cross-examination, Dr. Nicholl admitted that his conclusions were based on the subjective reporting of symptoms by the defendant. Dr. Nicholl additionally testified to the monetary amount he charges for his services and testimony.

Assignments of Error

Appellant presents the following issues for review on appeal: (1) whether the evidence is sufficient to support defendant’s convictions of negligent homicide; (2) whether the trial court committed reversible error in denying defendant’s requests for special jury instructions; and (3) whether defendant’s sentence is illegal.

Sufficiency of the Evidence

Appellant argues that the evidence presented at trial was not sufficient to support the verdicts of negligent homicide. Moreover, appellant argues that although negligent homicide is a statutorily responsive verdict to the charge of vehicular homicide, it is not a lesser included offense. Therefore, appellant argues that convictions for an offense that is not “truly responsive” or lesser-included to the charged offense violated defendant’s due process rights.
The State responds that defendant failed to make a contemporaneous objection to the inclusion of the responsive verdict of negligent homicide. Therefore, the State argues that, because the evidence supports the charged offense 1 T3of vehicular homicide, defendant’s convictions for the legislatively responsive offense should be affirmed, regardless of whether the evidence supports the responsive verdict.
When a defendant fails to object to a legislatively responsive verdict, the defendant’s conviction will not be reversed, whether or not that verdict is supported by the evidence, as long as the evidence is sufficient to support the offense charged. State v. Wilkinson, 00-339 (La.App. 5 Cir. 10/18/00), 772 So.2d 758, 765, writ denied, 00-3161 (La.10/12/01), 799 So.2d 494. The Louisiana Supreme Court explained in *543 State ex rel. Elaire v. Blackburn, 424 So.2d 246, 251-52 (La.1982), cert, denied, 461 U.S. 959, 103 S.Ct. 2432, 77 L.Ed.2d 1318 (1983):
The 1982 amendment adding Section C to Article 814 now gives the trial judge discretion, on motion of either side, to exclude a responsive verdict which is not supported by the evidence. Therefore, even if the offense is legislatively designated as responsive by Article 814, the defendant may timely object to an instruction on a responsive verdict on the basis that the evidence does not support that responsive verdict. If the court overrules the objection and the jury returns a verdict of guilty of the responsive offense, the reviewing court must examine the record to determine if the responsive verdict is supported by the evidence and may reverse the conviction if the evidence does not support the verdict.™14 However, if the defendant does not enter an objection (at a time when the trial judge can correct the error), then the reviewing court may affirm the conviction if the evidence would have supported a conviction of the greater offense, whether or not the evidence supports the conviction of the legislatively responsive offense returned by the jury.
FN14. Of course, this applies only to a responsive verdict that is listed in Article 814 but is not truly a lesser and included grade of the charged offense.
It would be unfair to permit the Defendant to have the advantage of the possibility that a lesser “compromise” verdict will be returned (as opposed to being convicted of the offense charged) and then to raise the complaint for the first time on appeal, that the evidence did not support the responsive verdict to which he failed to object.
Ela.ire v. Blackburn, at 252.
[ 14Appellant asserts on appeal that “the defense objected to the trial court’s instructions that negligent homicide is a lesser offense of vehicular homicide, because it is a statutorily-created responsive verdict, but not a true lesser offense. This objection was overruled.”
Upon review of the transcript, however, appellant’s assertion is a mischaraeterization. The following exchange occurred between the trial judge and the parties at a bench conference regarding the proposed jury instructions:
The Defense: It’s not an objection to the accuracy or to the propriety of the charge, but it’s the sequence of things. Starting at Page 6, Your Honor.
The Court: Okay.
The Defense: Where you, I think, in a very nice neat way, starting with the paragraph that begins, “thus, in this case,” you outline the Vehicular Homicide elements.
The Court: Okay.
The Defense: And — -But the next paragraph gets to be, I think, confusing because you have — you don’t then go to first define the responsive verdict of Negligent Homicide; you just start telling them that the verdict has to be an appropriate response to the charge. And in order to — “If you’re not convinced,” and going on to Page 7, you I just think that the sequencing of it. It’s just a writing style. But you might wish to reorder it and do the Negligent Homicide and then tell them that if they don’t find Vehicular Homicide or they — and they don’t find Negligent Homicide. In other words, the language is fine; it’s just the sequencing in which it’s given.
⅝ ⅜ ⅝ ⅝ ⅜ ⅝
The Law Clerk: It’s explaining a responsive verdict, and it says “A responsive verdict of this charge.”
*544 The Defense: Yeah. And ray own preference would be would be to use the word “responsive” as opposed to “lesser;” because this is not your classic “lesser” |1swhere it’s, you know, first and second degree or-It’s really a hybrid. It’s a responsive verdict.
An irregularity or error cannot be availed of after verdict unless it was objected to at the time of occurrence. La. C.Cr.P. art. 841. “The defendant must state the basis for his objection when he makes it so that the trial judge has an opportunity to make the proper ruling and prevent or cure an error. The specific error which the trial judge is making must therefore be pointed out to the judge, and it is settled that defendant is limited on appeal to grounds for the objection articulated at trial.” State v. Jackson, 450 So.2d 621 (La.1984).
Here, appellant’s assertion, that it properly and contemporaneously objected to the inclusion of the responsive verdict of negligent homicide, is not supported by the record. The transcript reflects that defense counsel merely objected to the sequencing of the offenses, rather than the inclusion of the responsive verdict, expressly prefacing that his objection was not “to the accuracy or to the propriety of the charge.”
Moreover, viewing the record in its entirety, it reflects an overall acquiescence by defense counsel to the inclusion of negligent homicide as a responsive verdict. Such evidence includes defense counsel’s opening argument when defense counsel informed the jury that negligent homicide would be a responsive verdict, and at the close of trial when defense counsel urged a special jury instruction relating only to the responsive verdict of negligent homicide.
Viewing the totality of the record, we find that defense counsel did not contemporaneously object to the inclusion of the responsive verdict of negligent homicide to be charged to the jury. Accordingly, the proper question on appeal is whether the evidence was sufficient to support the charged offense, vehicular homicide.
| 1BThe standard of review for determining the sufficiency of evidence is whether, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the State proved the essential elements of the crime beyond a reasonable doubt. Jackson v. Virginia, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979). Under the Jackson standard, a review of the record for sufficiency of the evidence does not require the court to ask whether it believes that the evidence at trial established guilt beyond a reasonable doubt. State v. Alexander, 12-194 (La.App. 5 Cir. 5/16/13), 119 So.3d 120 (citing State v. Jones, 08-20, p. 6 (La.App. 5 Cir. 4/15/08), 985 So.2d 234, 240). Rather, the reviewing court is required to consider the whole record and determine whether any rational trier of fact would have found guilt beyond a reasonable doubt. Id.
The credibility of witnesses is within the sound discretion of the trier of fact, who may accept or reject, in whole or in part, the testimony of any witness. State v. Trepagnier, 07-749, 07-750 (La. App. 5 Cir. 3/11/08), 982 So.2d 185, 191, writ denied, 08-0784 (La.10/24/08), 992 So.2d 1033. When the trier of fact is confronted by conflicting testimony, the determination of that fact rests solely with that judge or jury, who may accept or reject, in whole or in part, the testimony of any witness. Alexander, 12-194 (citing State v. Bailey, 04-85, p. 4 (La.App. 5 Cir. 5/26/04), 875 So.2d 949, 955, writ denied, 04-1605 (La.11/15/04), 887 So.2d 476, ceri. denied, 546 U.S. 981, 126 S.Ct. 554, 163 L.Ed.2d 468 (2005)).
*545 The testimony of one witness is sufficient support for a requisite factual finding, if believed by the trier of fact and there is an absence of internal contradiction or irreconcilable conflict with physical evidence. State v. Baker, 01-1397, p. 3 (La.App. 5 Cir. 4/30/02), 816 So.2d 363, 365. It is not for the appellate court to reweigh the evidence absent impingement on the fundamental due process |17of law. State v. Allen, 10-430, p. 9 (La.App. 5 Cir. 2/15/11), 62 So.3d 156, 162 (citing Bailey, 04-85 at 2-4, 875 So.2d 949, 954-55).
Moreover, when circumstantial evidence forms the basis of a conviction, La. R.S. 15:438 requires that the elements of the offense be proven so that every reasonable hypothesis of innocence is excluded. State v. Schnyder, 06-29, p. 5 (La. App. 5 Cir. 6/28/06), 937 So.2d 396, 400. “... [T]he pertinent question on review [is] not whether the appellate court found that defendant’s hypothesis of innocence offered a reasonable explanation for the evidence at trial but whether jurors acted reasonably in rejecting it as a basis for acquittal.” State v. Pigford, 05-0477, p. 5 (La.2/22/06), 922 So.2d 517, 520 (per cu-riam). All of the evidence, both direct and circumstantial, must be sufficient to satisfy a rational trier-of-fact that the defendant is guilty beyond a reasonable doubt. State v. Schnyder, supra.
La. R.S. 14:32.1, vehicular homicide, provides in pertinent part:
A. Vehicular homicide is the killing of a human being caused proximately or caused directly by an offender engaged in the operation of, or in actual physical control of, any motor vehicle, aircraft, watercraft, or other means of conveyance, whether or not the offender had the intent to cause death or great bodily harm, whenever any of the following conditions exist and such condition was a contributing factor to the killing:
6) The operator is under the influence of one or more drugs which are not controlled dangerous substances and which are legally obtainable with or without a prescription and the influence is caused by the operator knowingly consuming quantities of the drug or drugs which substantially exceed the dosage prescribed by the physician or the dos- ■ age recommended by the manufacturer • of the drug.
The parties stipulated that the victims died of injuries sustained in the multi-vehicle crash. Moreover, the State presented witnesses, Sean O’Brien King and Lena Liller, who testified that they observed defendant hit the victims’ vehicle. Photographs were admitted reflecting how the damage to the victims’ vehicle matched up with the paint and grill damage to defendant’s vehicle. Moreover, | ^accident reconstruction experts, Officer Bagert and Trooper Elliot, both testified that defendant’s vehicle striking the victims’ vehicle was the impact that forced the victims’ vehicle across the median and into oncoming traffic. Therefore, a rational trier of fact could find that the State satisfied beyond a reasonable doubt that defendant’s operation of a motor vehicle was the proximate or direct cause of the killing of three human beings.
The defense offered expert testimony of Dr. Nicholl that defendant was indeed not in control of her vehicle, but had fainted and was unconscious immediately prior to and for a brief period of time after the collision; however, Dr. Nicholl admitted that his opinion was solely based on defendant’s subjective reporting of symptoms. Moreover, several witnesses’ recollection of the events that transpired on Interstate 10 contradict defendant’s claim that she fainted due to anxiety and fear brought on by a road rage incident with a black SUV. Witnesses consistently testified that defen *546 dant was travelling at a high rate of speed, bobbing and weaving in and out traffic before colliding with two vehicles, including the victim’s vehicle, sending it across the median into oncoming traffic. Witnesses as well as the accident reconstruc-tionists consistently testified that defendant continued travelling for a half mile, with her air bag deployed, before eventually coming to a controlled stop on the right shoulder of Interstate 10. Moreover, two witnesses testified that the black SUV that defendant claimed harassed her, did not exist. Based on this testimony, a rational trier of fact could find that defendant was in fact conscious and in control of her actions and her vehicle.
The State offered scientific blood evidence, drawn from defendant on the date of the crash, revealing a blood concentration of dextromethorphan, the active ingredient in Dayquil, of 74 ng/mL. State’s expert, Dr. George, testified that one dose of Dayquil or 20 milligrams of dextrome-thorphan would produce _ a blood | ^concentration level of 2 ng/mL to 4 ng/ mL. Defendant testified at trial that she took one capsule of Dayquil (10 mg) at approximately 6:00 a.m. and possibly another (10 mg) at lunchtime. Dr. George testified that defendant’s blood concentration of dextromethorphan, however, reflected nearly five times the maximum recommended four doses per day. The defense presented genetic testing of defendant that Dr; George confirmed showed that defendant had an inactive enzyme that inhibited her from metabolizing dex-tromethorphan. Despite this evidence, however, Dr. George testified that this genetic finding did not affect his opinion that a blood level of 74.6 ng/mL is irreconcilable with a person taking one or two doses of dextromethorphan, even assuming no metabolism whatsoever. Dr. George further testified, however, that based upon the lab report, he was unable to determine the quantity of the medication consumed by defendant, when it was consumed, or how frequently it was consumed. Moreover, when questioned about independent testing done by the defense of the blood, indicating only a 13 ng/mL dextromethor-phan concentration, Dr. George explained that there would be degradation of the blood sample after two years. Although defendant maintained that she took only one to two capsules of Dayquil on the date of the crash, a rational trier of fact, based on the blood evidence and expert testimony of Dr. George, could have rejected defendant’s testimony and found beyond a reasonable doubt that defendant consumed more than the recommended dosage of Dayquil.
Furthermore, Dr. George testified that at high doses, such as 74 ngdnL, dextro-methorphan can act like a “dissociative anesthetic,” in which a person “doesn’t really recognize exactly where [they] are or what’s going on.” The State presented evidence and testimony from multiple witnesses attesting to defendant’s strange behavior on the date of the crash consistent with Dr. George’s description. Sean O’Brien King testified that defendant acted “weird,” and behaved like [ 2onothing happened. Officer Bagert testified that while someone could be disoriented by the deployment of an air bag, defendant “acted strangely,” “didn’t seem right,” and “seemed that she was disassociated from what was going on,” “like, in a separate reality.” These witness observations, taken together with the fact that defendant continued to travel for a half mile with her air bag deployed, in light of the toxicologist’s testimony concerning the effects of high doses of dextromethorphan, support a finding by a rational trier of fact that defendant was in fact impaired by the high levels of dextromethorphan in her blood at the time of the crash.
*547 Accordingly, viewing the evidence in the light most favorable to the prosecution, a rational trier of fact could conclude the State proved the essential elements of vehicular homicide beyond a reasonable doubt. As such, the evidence was sufficient to support the responsive verdicts of negligent homicide.

Jury Charges

On appeal, appellant asserts that the trial court erroneously denied four defense requests for special jury instructions relating to legal presumptions, sudden emergency, justification and unconsciousness.
La.C.Cr.P. art. 802 provides that the trial court “shall charge the jury ... [a]s to the law applicable to the case[.]” The State and the defendant shall have the right to submit special written jury charges. La.C.Cr.P. art. 807. The court shall give a requested special jury charge “if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.” La.C.Cr.P. art. 807. See also State v. Tate, 01-1658, p. 20 (La.5/20/03), 851 So.2d 921, 937, cert, denied, 541 U.S. 905, 124 5.Ct. 1604, 158 L.Ed.2d 248 (2004); State v. Fasola, 04-902, p. 19 (La.App. 5 Cir. 3/29/05), 901 So.2d 533, 545, twit |2idenied, 05-1069 (La.12/9/05), 916 So.2d 1055. Failure to give a requested jury charge constitutes reversible error only when there is a miscarriage of justice, prejudice to the substantial rights of the accused, or a substantial violation of a constitutional or statutory right. State v. Harris, 01-2730, p. 46 (La.1/19/05), 892 So.2d 1238, 1261, cert, denied, 546 U.S. 848, 126 S.Ct. 102, 163 L.Ed.2d 116 (2005).

A. Special Jury Instruction as to Legal Presumptions

Appellant argues that the trial court’s denial of defendant’s requested jury charge regarding the legal presumption that arises when evidence is not disclosed by the prosecution was reversible error. Specifically, defense counsel proposed that the judge read the text of La. R.S. 15:432 to the jury.[6] The transcript reflects the following exchange between the court and defense counsel:
The Court: There is no evidence that the State didn’t produce something to you.
Defense: Well, how about the fact that the State did not call as a witness for the Prosecution the man that actually drove into the vehicle and killed those people. They didn’t call him. That’s evidence under their control.
The Court: I’m going to deny it.
Now, for the first time on appeal, appellant argues that the instruction should have been given because the State failed to disclose the videotape of defendant being Mirandized and the State failed to properly preserve defendant’s blood sample to *548 ensure the sample could be independently tested by the defense.
|g2A defendant must state the basis for the objection when it is made in order for the trial court to have the opportunity to make the proper ruling and prevent or cure an error. State v. Jackson, 450 So.2d at 634. The specific error must be pointed out to the trial judge, and defendant is limited on appeal to the grounds for the objection articulated at trial. Id.
Because appellant is limited to the grounds for the objection articulated at trial regarding the special jury instruction relating to La. R.S. 15:432, the instant assignment of error is not properly before this court and will not be reviewed.
B. Special Jury Instruction as to “Sudden Emergency ”
Appellant argues that the trial court’s denial of defense request for a special jury instruction regarding sudden emergency as stated in a Louisiana Civil Law Treatise was reversible error. At trial, defense counsel argued that because sudden emergency is a defense to a claim of negligence in a civil suit, then it must also be a defense to a charge of criminal negligence. Specifically, defense counsel’s written request for special jury instruction on “sudden emergency” stated:
Sometimes a person finds herself in an emergency not of her own making. This does not really change the standard of care to which we hold such a person but it does mean that you must take into account the circumstances of sudden emergency. If the defendant was in a position of imminent peril which she could not have anticipated, without sufficient time to consider the best way to avoid an approaching danger, she is not negligent if she fails to choose what subsequently and upon calm reflection might appear to have been a better method of avoiding the danger. Of course, the mere fact that the defendant faced an emergency does not make her conduct reasonable.
While you should consider the emergency in determining the reasonableness of her conduct, you may determine that her conduct in the face of the emergency was nonetheless unreasonable.
During a bench conference, the trial court denied the requested jury instruction on sudden emergency as an incorrect statement of law. The trial court stated that the jury instruction was not appropriate because it is used in civil cases | Mto rebut a presumption of negligence which does not exist in criminal cases. The trial court further stated that the statute on negligent homicide does not impose an affirmative duty and reasoned that it would confuse the jury.
A requested jury charge “need not be given if it is included in the general charge or in another special charge to be given.” La.C.Cr.P. art. 807. Defendant’s requested jury instruction directing the jury to consider the “circumstances of sudden emergency” and whether defendant’s “conduct” was “reasonable” or “unreasonable” under those circumstances is already included in the general charge regarding negligent homicide. Within the jury instruction regarding negligent homicide, the trial court instructed the jury that:
Criminal negligence exists when there is such disregard of the interest of others that the offender’s conduct amounts to a gross deviation below the standard of care expected to be maintained by a reasonably careful [person] under similar circumstances.
In order to have the [sic] criminal negligence, it is not sufficient that a person merely fail to act reasonably. The conduct must be so far below that expected *549 of a reasonably careful person that it is to be considered gross deviation.
Here, the trial court clearly instructed the jury to consider the circumstances and whether defendant’s conduct was reasonable under those circumstances. In addition, the jury was presented with defendant’s theory of sudden emergency relating to the road rage incident with a black SUV. The defense presented this theory through the testimony of defendant, Ms. Bradley, Dr. Nicholl, and through defense counsel’s closing argument. Therefore, we find that the trial court properly denied defendant’s requested jury instruction regarding sudden emergency.

C. Special Jury Instruction as to Justification

Defendant requested special jury instructions relating to justification. The trial court read the following instruction on justification:
^When considering the responsive verdict of Negligent Homicide, the Defendant is asserting a defense of justification. The Defendant’s conduct, otherwise criminal, is justified if the offense charged consists of a failure to perform an affirmative duty and the failure to perform is caused by physical impossibility.
Thus, if you find that the offense of Negligent Homicide in this case consists of the Defendant’s failure to perform an affirmative duty and two, that the Defendant’s failure to perform was caused by physical impossibility, then you must find the Defendant not guilty of Negligent Homicide.
The trial court declined to read that portion of defendant’s requested instruction that stated:
If you find that the defendant has raised the defense that her conduct is justified, the State must prove that the defendant’s conduct was not justified. Remember, the State bears the burden of proving the guilt of the defendant beyond a reasonable doubt.
Appellant argues that the trial court’s limited instruction on justification was error.
As stated above, the court shall give a requested special jury charge “if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent.” La.C.Cr.P. art. 807. We find that the trial judge properly excluded that portion of the proposed jury instruction placing the burden on the State to prove defendant’s conduct was not justified as it is not a correct statement of the law. The defense of justification is an affirmative defense that must be proven by the defendant by a preponderance of the evidence. State v. Landry, 381 So.2d 462 (La.1980).

D. Special Jury Instruction on Unconsciousness

Additionally, we find that the trial court properly denied defendant’s request for special jury instruction regarding unconsciousness. Defendant filed a written requested jury instruction requesting that:
[P]ursuant to C.Cr.P. art. 807, R.S. 14:18(5), the Due Process Clauses of the United States and Louisiana Constitutions, Corpus Juris 125Secundum, Volume 22, § 131 and American Jurisprudence, Second Edition, Volume 21, § 42, that the Court incorporate the following into its general charge instructions regarding “unconsciousness,” to wit:
A person who was not conscious at the time of the conduct that is alleged to constitute the criminal negligence cannot be found to have had such a disregard of the interests of others such that the person’s conduct amounts to a gross deviation below that standard of care, and *550 that person may assert the defense that the conduct was justified because she was unconscious at the time of the alleged criminally negligent conduct, the state must prove that defendant’s conduct was not justified.
(Emphasis omitted).
At the conclusion of the bench conference, the trial court denied the requested jury charge on unconsciousness stating that it was an incorrect statement of law. The trial court also found that the jury instruction would confuse the jury and that unconsciousness was included in the general charge of criminal negligence. Appellant argues that the denial of the instruction was error.
Again, the court shall give a requested special jury charge “if it does not require qualification, limitation, or explanation, and if it is wholly correct and pertinent. It need not be given if it is included in the general charge or in another special charge to be given.” La.C.Cr.P. art. 807. Again, the proposed instruction places a burden on the State that does not exist and is not a correct statement of the law. Further, an instruction on unconsciousness was addressed and included in both the general charges of criminal negligence and negligent homicide. Accordingly, we find that the trial court’s exclusion of the requested special jury instruction was not an abuse of discretion and was proper.

Illegal Sentence

Appellant argues that defendant’s sentence is illegal. Specifically, appellant avers that the trial court imposed multiple sentences upon defendant, increasing defendant’s “original” sentence from “essentially, three years at hard labor and two | ¡¡¿years of active probation, to three years at hard labor and two years of home incarceration.”
The State responds that the trial court’s imposition of home incarceration instead of active probation was the result of four bench conferences and two brief recesses. The State asserts that the trial court explained that the change was due to the fact that the State previously did not agree to home incarceration but then later agreed. The State argues that defendant’s assignment of error is without merit, and defendant’s conviction and sentence should be affirmed.
The record reflects that the trial court initially imposed a sentence of “five years at hard labor on each count, to run concurrently with one another; three years imposed, two years active probation.” Following four bench conferences and two brief recesses, the trial court then stated: “the sentence is five years at hard labor, three years imposed, two years on home incarceration.” The trial court made clear that the sentencing hearing was ongoing and that her change in imposition of active probation to home incarceration was due to the State’s acquiescence to defendant being placed on home incarceration. The State’s acquiescence to home incarceration is evidenced by the transcript wherein the prosecutor stated that the State took no position and did not oppose defendant being placed on home incarceration.
La.C.Cr.P. art. 894.2 states in pertinent part:
A. Notwithstanding any other provision of law to the contrary, a defendant may be placed on home incarceration under the following conditions:
(1) The defendant is eligible for probation or was convicted of a misdemeanor or a felony punishable with or without hard labor.
(2) In felony cases, either:
(a) The Department of Public Safety and Corrections, through the division of *551 probation and parole, recommends home incarceration of the defendant and specific conditions of that home incarceration; or
|27(b) The district attorney recommends home incarceration.
Here, defendant was convicted of three counts of negligent homicide, a felony offense punishable with or without hard labor. As such, the trial court acted within her wide sentencing discretion to impose a sentence of home incarceration upon defendant’s release from the Department of Corrections.
Moreover, we are not persuaded by appellant’s argument that the trial court imposed multiple sentences that were either more onerous or vindictively imposed. The trial court’s initial pronouncement of sentence was never final and the sentencing hearing was ongoing. Moreover, defendant did not object to the sentence as vindictive at the hearing, nor was this issue raised in defendant’s motion to reconsider sentence.
Accordingly, this assignment of error lacks merit.

Error Patent Review

This Court routinely reviews the record for errors patent in accordance with La.C.Cr.P. art. 920; State v. Oliveaux, 312 So.2d 387 (La.1975) and State v. Wetland, 556 So.2d 175 (La.App. 5 Cir.1990). A review of the record reveals an error patent in this case.
La.C.Cr.P. art. 894.2(C), Home incarceration; requirements, provides:
The court shall specify the conditions of home incarceration when it imposes such sentence upon the defendant. The conditions may include any condition reasonably related to implementing or monitoring a sentence of home incarceration, including curfew, electronic or telephone monitoring, home visitation by persons designated by court, and limitation of the defendant’s activities outside of the home.
It appears that the trial court in this case failed to specify the conditions of home incarceration at the time of sentencing. This Court has recognized the failure to comply with this requirement as a patent error and remanded the matter for a hearing regarding the conditions of home incarceration. See State v. Hebert, 02-[1252,2S pp. 10-11 (La.App. 5 Cir. 4/8/03), 846 So.2d 60, 66-67; State v. Parent, 01-50 (La.App. 5 Cir. 5/30/01), 788 So.2d 685, 690; State v. Delanueville, 11-379, pp. 20-22 (La.App. 5 Cir. 2/14/12), 90 So.3d 15, 29-30, writ denied, 12-0630 (La.09/21/12), 98 So.3d 325. When a defendant has signed a form outlining the • conditions of home incarceration, this Court has found that to be sufficient to inform the defendant of the conditions. Hebert, supra, at 66-67. However, nothing in the record suggests that defendant signed a form outlining such conditions. Thus, we remand the matter to the trial court to impose conditions of defendant’s home incarceration.

Decree

Considering the foregoing, we affirm defendant’s convictions and sentences. We remand the matter to the trial court to comply with the provisions of La.C.Cr.P. art. 894.2.

AFFIRMED & REMANDED FOR COMPLIANCE WITH LA, C.CR.P. ART. 894.2.

. The original bill of information did not specify or describe the crimes charged.

. The trial court denied defendant's motion to quash the bill of information, alleging La. R.S. 14:32.1(A)(6) to be unconstitutionally vague.

. Defendant testified at trial that at the time of the collision, she weighed 250 pounds.

. Evidence custodian, Sergeant Alan Abadie of the Kenner Police Department, testified that the blood evidence, once tested, was placed, unrefrigerated, on a shelf for the two years prior to the independent testing conducted by the defense.

.Dr. Nicholl specifically was not recognized as an expert in toxicology and pharmacology.

. § 432. Effect of legal presumptions; rebutting evidence; illustrations
A legal presumption relieves him in whose favor it exists from the necessity of any proof; but may none the less be destroyed by rebutting evidence; such is the presumption attaching to the regularity of judicial proceedings; that the grand jury was legally constituted; that public officers have done their duty; that a relation or subject-matter once established, continues, but not that it pre-existed; that the defendant intended the natural and probable consequence of his act; that the defendant is innocent; that the defendant is sane and responsible for his actions; that the person in the unexplained possession of property recently stolen is the thief; that evidence under the control of a party and not produced by him was not produced because it would not have aided him; that the witnesses have told the truth.